Commonwealth *v.* Troy T., a juvenile.

COMMONWEALTH *vs.* TROY T., a juvenile.

No. 00-P-666.

Berkshire. December 11, 2001. - April 16, 2002.

Present: BROWN, LENK, & COWIN, JJ.

*Delinquent Child. Juvenile Court,* Delinquent child. *Threatening. Evidence,*
Threat.

At the trial of a complaint alleging that a juvenile was delinquent by reason of
threatening to murder a fellow student, in violation of G. L. c. 275, § 2,
the Commonwealth did not produce sufficient evidence to satisfy a rational
trier of fact beyond a reasonable doubt that the juvenile communicated to
the alleged victim an intent to injure her, where the allegedly threatening
statement was conveyed to the victim by a third party who had overheard
it, and where it could not be inferred from the evidence that the juvenile
intended for the third party to hear the statement and relay it to the victim.
[525-528]
At the trial of a complaint alleging that a juvenile was delinquent by reason of
threatening to murder a fellow student, in violation of G. L. c. 275, § 2,
the Commonwealth did not produce sufficient evidence concerning the
context in which the allegedly threatening statement was made, including
the juvenile's actions and demeanor at the time, to satisfy a rational trier of
fact beyond a reasonable doubt that the juvenile's statement constituted an
expression of intent to inflict injury. [528-531]

COMPLAINT received and sworn to in the Berkshire County
Division of the Juvenile Court Department on October 27, 1999.

The case was heard by *Paul E. Perachi,* J.

*Jennifer Tyne* for the juvenile.

*Marianne Shelvey,* Assistant District Attorney, for the
Commonwealth.

LENK, J. After a jury-waived trial in March, 2000, the juvenile
defendant was adjudicated delinquent by reason of threatening
to murder a fellow student on October 27, 1999, in violation of
G. L. c. 275, § 2. On appeal, the juvenile asserts two claimed
errors: (1) that the judge erred in denying his motion for a

required finding of not guilty where the Commonwealth's evidence was insufficient as to each element of the crime; and (2) that the judge erred in admitting evidence of prior bad acts. We reverse.

*Facts.* The Commonwealth presented the testimony of three witnesses: Amber, Tara (the alleged victim), and the school police officer to whom Tara first made complaint. The defense called as witnesses John, Adam, and the juvenile. Amber, Tara, John, and Adam are all juveniles[1] and were all students at the same high school in the fall of 1999, albeit in different grades and classes.

Amber, fourteen years old, testified that she was in the ninth grade that fall and was in the same English class as the juvenile, also a ninth grader. She testified to events involving the juvenile that occurred on three dates and at three locations: (a) on Friday evening, October 22, 1999, at the local shopping mall; (b) on Tuesday, October 26, 1999, in the hallway between classes at school; and (c) on Wednesday, October 27, 1999, in English class.

As to the Friday evening events at the mall, Amber testified that she was there with her school friend Chelsea, waiting together for Chelsea's mother to provide them a ride home. Also in the same area were her ninth-grade classmate John, his girlfriend Tara (an eighth grader whom Amber knew from French class), and an unnamed friend; the two groups were chatting amongst themselves. There was a third group nearby, consisting of the juvenile and his friend, and the two were talking to each other. Amber did not socialize with the juvenile, but he had said "hey" generally to the larger group there. While engaged with her own group, Amber nonetheless overheard the conversation between the juvenile and his friend, in which the juvenile said he wanted to get nitrogen to make a bomb, go to a football game on a weekend night, and "blow up, kill, blow up the jocks." Amber also testified, "[M]e and my friend Chelsea, she was like, and I was like, you know, 'You can't get nitrogen

---

[1]All of the juveniles' names are pseudonyms.

at the mall.' "[2] At the time, Amber thought the juvenile's remarks a joke and bantered about them with John, a "jock." Amber did not report these remarks to school authorities at the time and there is no indication in Amber's testimony that she conveyed the remarks to Tara that evening.

Between classes on the following Tuesday, October 26, 1999, Amber stopped in on a hallway conversation that her friend Chelsea was having with the juvenile and his friend Adam. The juvenile displayed petitions he was passing around headed "Bomb the Soviets" and "break treaty."[3] Amber declined to sign. She also testified that, in the same conversation, the juvenile said to her and her friend Chelsea that, in the next few weeks, he wanted to go to even-numbered classrooms with a gun or shotgun and "gun them down like little dominos." There is no indication in Amber's testimony that she told Tara, who was not present for the conversation, of the petition or the remarks, or that she informed any school authorities of them at the time.

Amber testified that she also heard the juvenile say something in English class the next day, Wednesday, October 27, 1999. She, John, and the juvenile were in that class; Tara was not. Amber and the juvenile were seated some rows apart, she at the front, the juvenile behind and near John. Caitlin, a blonde female student, walked past Amber to speak with the teacher. As Caitlin passed, Amber heard the juvenile say to two nearby friends, "Oh, those dumb blondes, you know, they have to go too." Amber was not herself frightened by the statement and did not report it initially either to Caitlin or to school authorities. She was more afraid for Tara, who is blonde, and thereafter told her and John of it.

Tara, fourteen years old, testified that she had no classes with the juvenile and acknowledged that the juvenile had never said anything to her. When at the mall on October 22 with John and

---

[2]The record does not disclose to whom this statement was made, i.e., whether it was conversation between Amber and Chelsea or between one or both of them and the juvenile.

[3]Amber initially testified that the petition reflected the juvenile's wish "to kill the Soviet Union or Soviets and the Jewish people," but agreed on cross-examination that the petition referred to the Soviet Union and treaties.

Bethany, she said that, after Amber came to her, drew her attention to the juvenile, and told her something, she felt concerned (but "like not to freak out") about John and what was going to happen at school. Tara then testified to a conversation she had with Amber in French class on Monday, October 25, that caused her to feel "more concerned for people," that "someone was going to get hurt." Two days later, on Wednesday, October 27, she spoke with Amber in the front lobby. Tara then felt "really freaked out . . . because of the statement that she had told me was directed toward me" and was afraid that the juvenile was going to hurt her.

Visibly shaken, Tara told a city police officer assigned to the school about her concerns. The officer testified that Tara was crying and highly emotional and that she told him that she and her boyfriend were going to be shot because of the juvenile's statements about blondes and jocks.[4] After talking with Tara, the officer called the juvenile to his office and informed him of the allegation. The juvenile volunteered that he was joking and asked why he was being harassed. The juvenile had no weapons on him. In a consensual search of the juvenile's backpack, the officer discovered a spent .12 gauge shotgun shell and a $CO_2$ cartridge which, the officer testified, was such as might be used in BB or paintball guns. No incriminating evidence was found in a later consensual search of the juvenile's bedroom. The officer did not interview Tara's boyfriend John. The juvenile was subsequently charged in juvenile court on the officer's complaint of the offense for which he later stood trial.

The defense witnesses were John, Adam, and the juvenile. John, fifteen years old, testified that he had neither heard nor been told of the juvenile's reported remarks and was not made afraid by the remarks once he later learned of them. Adam, the juvenile's fourteen year old friend, testified that he and the juvenile had found the spent shotgun shell and cartridge near local railroad tracks in the month or so before October 27. The fifteen year old juvenile testified that his petition to bomb the Soviets was a joke in view of the prior dissolution of the then

---

[4]The officer's testimony regarding this statement was admitted over objection as an excited utterance. The judge had previously permitted Amber and Tara to testify, over objection, as to pre-October 27, 1999, events.

nonexistent Soviet Union. He acknowledged having asked Amber to sign the petition but denied having made either the "gun [students] down like little dominos" or the "dumb blondes" comment. He testified that, when called to account for the remarks by authorities, he surmised that Amber or Tara was the source of the complaint because they were the only girls that he had had contact with in the prior week.

*Motion for required finding of not guilty.* We review the denial of such a motion using the familiar *Latimore* standard, *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), and consider "whether the Commonwealth produced enough evidence, taken in the light most favorable to the Commonwealth, to satisfy any rational trier of fact beyond a reasonable doubt that each element of the crime was present." *Commonwealth* v. *Hilton*, 398 Mass. 63, 64 (1986). See Mass.R. Crim.P. 25(a), 378 Mass. 896 (1979). Here, the crime at issue is threatening to commit the crime of murder. General Laws c. 275, § 2, provides:

> "If complaint is made to any such court or justice that a person has threatened to commit a crime against the person or property of another, such court or justice shall examine the complainant and any witnesses who may be produced, on oath, reduce the complaint to writing and cause it to be subscribed by the complainant."

The term "threat" is not statutorily defined, but its elements have been held to "include an expression of intention to inflict a crime on another and an ability to do so in circumstances that would justify apprehension on the part of the recipient of the threat." *Commonwealth* v. *Robicheau*, 421 Mass. 176, 183 (1995). See *Commonwealth* v. *Sholley*, 432 Mass. 721, 727 (2000).[5] The Commonwealth sought to prove that the juvenile, on October 27, 1999, expressed his intent to murder Tara and his ability to do so in circumstances justifying apprehension on her part as recipient of the threat.

The juvenile contends that he cannot be found guilty beyond

---

[5]For a collection and analysis of various Federal cases concerning whether a statement constitutes a "true threat" not deserving of First Amendment protection, see Rothman, Freedom of Speech and True Threats, 25 Harv. J.L. & Pub. Pol'y 283 (2001).

a reasonable doubt because the Commonwealth failed to produce evidence that he communicated to Tara an intent to injure her; that the alleged threatened injury, if carried out, would constitute a crime; or that he made a threat in circumstances that could reasonably have caused Tara to fear that he had both the intent and the ability to carry out the threat.

As to the juvenile's initial contention, that the Commonwealth failed to prove he communicated to Tara an intent to injure her, two observations are in order. First, it is uncontroverted that the juvenile never made the "dumb blonde" comment directly to Tara or, for that matter, to Amber; he said it to a couple of nearby friends and Amber overheard it. It was she who later told Tara of it. Second, while the cases have never expressly articulated communication as an element of the crime of threatening, it is implicit in them that the subject threat be communicated in some manner by the defendant. See, e.g., *Commonwealth* v. *Milo M.*, 433 Mass. 149, 158 (2001) ("Finally, we conclude that the record supports the finding that the juvenile communicated the threat, vis-à-vis the second drawing, to [the targeted victim]"); *Commonwealth* v. *Haggins*, 38 Mass. App. Ct. 976, 977 (1995) (threats directed toward a racially defined group of local residents likely insufficient to support conviction because statements not communicated to the persons threatened); Model Jury Instructions for Use in the District Court § 5.03 (1995) ("the Commonwealth must prove three things beyond a reasonable doubt: *First*: That the defendant communicated to *(alleged victim)* an intent to injure his (her) person or property, now or in the future"). See also Hrones & Homans, Jr., Massachusetts Jury Instructions — Criminal No. 6-12 (2d ed. 2001) ("First: that the defendant did in fact express to [the alleged victim] an intent to inflict harm on [the alleged victim]"). The question, then, is whether a defendant can be found guilty beyond a reasonable doubt where, as here, the alleged threat was communicated to its purported target by a third party to whom the communication of the threat by the juvenile was itself indirect.

We are unaware of any Massachusetts case where the threat later communicated to the victim was initially communicated indirectly to a third party or where, as here, the threat was

simply overheard by a third party. Indeed, to date, our threat cases have involved direct communication between the defendant and the target of the threat. See, e.g., *Commonwealth* v. *Sholley*, 432 Mass. at 724 (defendant, while pointing finger at victim assistant district attorney, yelled, "Watch out, Counselor"); *Commonwealth* v. *Milo M., supra* (juvenile defendant's first drawing was confiscated from him by a third party and shown by her to the targeted victim depicted in it; juvenile made second drawing and held it up to show victim, who asked another student to bring it to her; trial judge ruled first drawing could not serve as basis for threat because it was not shown by juvenile to victim); *Commonwealth* v. *Ditsch*, 19 Mass. App. Ct. 1005 (1985) (defendant threatened mother-in-law in letter he sent to her); *Commonwealth* v. *Strahan*, 39 Mass. App. Ct. 928 (1995) (defendant communicated threat to damage aquarium whale-watch vessel to aquarium employee); *Commonwealth* v. *Elliffe*, 47 Mass. App. Ct. 580, 581-582 (1999) (defendant yelled to his ex-wife "Drop the charges!" as he was assaulting and battering her). See also *Commonwealth* v. *Chalifoux*, 362 Mass. 811 (1973) (defendant verbally communicated threat to victim); *Commonwealth* v. *McWhinnie*, 5 Mass. App. Ct. 877 (1977) (defendant threatened victim with knife); *Commonwealth* v. *Carpinto*, 37 Mass. App. Ct. 51 (1994) (defendant made threatening phone calls to victim). The putative threat need not be oral, verbal, or face to face. See, e.g., *Commonwealth* v. *Ditsch, supra.*

Though not previously addressed in our cases,[6] it nonetheless seems quite reasonable that a threat may be communicated by a third party to the defendant's intended victim. In such instances, however, we hold that the Commonwealth must prove, among other things, that the defendant intended to communicate the threat to the third party who acts as intermediary. Intent, of

---

[6]The Commonwealth suggests that *Commonwealth* v. *Strahan, supra*, may be read as establishing that a third party may transmit a threat to additional victims. The circumstances, however, in *Strahan* were quite different from those here. *Strahan* dealt with the threat to commit a property crime that was communicated to an agent of the property owner, a corporate entity. 39 Mass. App. Ct. at 929. The crime was complete upon this communication and was not enhanced by the additional number of "victims" created by the agent's subsequent dissemination of the statements to fellow employees.

course, may be proved by circumstantial evidence. See *Commonwealth* v. *LaPerle*, 19 Mass. App. Ct. 424, 427 (1985). The burden will be an onerous one where the third party intermediary is also an eavesdropper.

In this regard, the Commonwealth argues that it can be inferred from the juvenile's series of violent and disturbing "public" comments, made to or in the presence of Amber, Tara's friend, that the juvenile intended his statements thereby to reach Tara and other blondes. There are difficulties with this.

As to the putative threat itself, the "dumb blonde" comment, the juvenile neither made it directly to Amber, who was present, nor to Tara, who was not, and he did not make it in circumstances permitting the inference that he intended it to be heard by anyone other than the nearby friends to whom he said it.[7] That Amber did overhear it is not by itself enough to establish that the juvenile intended her to do so. Nothing in the body of the statement suggests a desire that it be disseminated widely and the record fails to provide any contextual details that might substantiate such an inference. For instance, nothing indicates that the juvenile made his comment at an abnormal vocal level, glanced at Amber or other nonparticipants as he made it, gestured in an attention-seeking fashion, or knew that Amber regularly eavesdropped on conversations and dispersed overheard comments to others.

Further, nothing in the "dumb blondes" comment suggests that Tara, in particular, was the juvenile's intended target such that one hearing or even overhearing his comment would likely communicate it to her. It does not refer to her by name or by distinguishing characteristics other than a standard hair color.[8] As to the juvenile's prior comments at the mall and in the hallway, none was made directly to Tara or concerned her specifically in any fashion. Other than her romantic affiliation with a reputed jock, nothing of record suggests that she is

---

[7] Amber testified: "[The juvenile] stated to — just to his peers around him, you know, it was like maybe two friends, he was like, 'Oh, those dumb blondes, you know, they have to go too.' "

[8] Somewhat inexplicably in this regard, Amber never told Caitlin of the remark, though Caitlin was the blonde young woman whose passage prompted the juvenile's comment.

Soviet, Jewish, a "jock," or a student in an even-numbered classroom. Amber, moreover, merely overheard the mall comment the juvenile made to his nearby friend and nothing of record suggests that the juvenile intended that she overhear it or, for that matter, communicate it to Tara. While it is true that the juvenile's hallway statements regarding the petition and his desire to "gun . . . down like little dominos" students in even-numbered classrooms were made directly to three students including Amber, those statements are not the basis of the prosecution. Moreover, they do not establish that the juvenile intended the next day to communicate to Amber as intermediary the "dumb blondes" comment that he made in quite different circumstances.

In view of all this, we conclude that the Commonwealth did not produce sufficient evidence to satisfy any rational trier of fact beyond a reasonable doubt that the juvenile communicated to Amber and thereby to Tara an intent to injure her.

The evidence appears insufficient in another respect as well. The Commonwealth in effect concedes that the statement "Oh, those dumb blondes, you know, they have to go too" is not, standing alone, an expression of intent to inflict injury. It contends, however, that because the statement does not stand alone but is instead part of a series of statements concerning plans to kill entire classes of students, that it does reveal an intent to inflict injury. The "too" part of the dumb blonde remark, on this view, reflects an ongoing conversation of threats: the juvenile expressed his intent to kill jocks, Soviets, and students in even-numbered classrooms, finally adding blondes to his list.

A threat is "the expression of an intention to inflict evil, injury, or damage on another" (citation omitted). *Commonwealth* v. *Ditsch*, 19 Mass. App. Ct. at 1005. In analyzing a putative threat, we eschew a technical parsing of the words used and instead consider the entire context in which a statement is made, including the defendant's actions and demeanor at the time, and prior communications between the defendant and the recipient. See *Sholley, supra; Milo M., supra; Strahan, supra; Elliffe, supra.* In *Commonwealth* v. *Strahan*, for example, an environmental activist said to the New England Aquarium's

whale-watching vessel employee that it was "illegal to harass whales," "I am assessing the enemy," and "I'm just looking for, for a place to put a hole in the boat." 39 Mass. App. Ct. at 929. The context for these statements included the defendant's history with the New England Aquarium (he regularly picketed the vessel, discouraged people from patronizing it, and was frequently ejected or banned from the site) and the fact that he made the statements while he stood on the vessel's gangplank carrying a knapsack. *Ibid.*

Likewise, in *Commonwealth* v. *Sholley,* the statement, "Watch out, Counselor" was held to evince an intent to injure where the defendant, a known father's rights activist, made the statement to the prosecutor responsible for the conviction of the defendant's friend, in circumstances where the defendant was " 'yelling' and 'screaming' in an angry tone of voice, he had just been crying out a prediction of 'war' and 'bloodshed,' and he stood only inches from [the victim] pointing his finger in her face." 432 Mass. at 726. In *Commonwealth* v. *Elliffe,* the utterance of "Drop the charges!" was a criminal threat given the beating that the defendant was then inflicting upon his ex-wife who had brought parental kidnapping charges against him. 47 Mass. App. Ct. at 583. In *Commonwealth* v. *Milo M.,* a student's drawing expressed the intent to harm his teacher, who was both the drawing's explicit subject and intended recipient. In concluding that the drawing constituted a threat, the court considered the content of both that drawing and of a previous drawing prepared minutes before, each of which included depictions of the juvenile perpetrating violence on his teacher, as well as the juvenile's angry and defiant posture toward his teacher when he presented the picture. 433 Mass. at 154-155.

Without doubt, then, attending circumstances, such as demeanor, prior behavior, and statements, may be relevant to probe the intent of the juvenile's "dumb blondes" remark on October 27. However, in the cases discussed, where statements were made that, taken alone and on their face, might not rise to the level of a threat, such as in *Sholley, Elliffe,* and *Strahan,* it was the immediate context at the time the statements were made that permitted the conclusion that the statements were the expression of an intent to injure another. Words are "to be

viewed 'in the context of the actions and demeanor which accompanied them.' " *Commonwealth* v. *Sholley*, 432 Mass. at 725, quoting from *Commonwealth* v. *Elliffe*, 47 Mass. App. Ct. at 582. There is no such evidence here, except in a considerably attenuated sense. The evidence here is only as to statements the juvenile made to different audiences (to Adam at the mall; to Chelsea, Adam, and Amber in the hall; to a couple of nearby persons in English class) on different days. There was no evidence as to his demeanor when making the "dumb blondes" statement or as to any of his actions accompanying that statement, or other statements he or his associates may have made shortly before or after the statement that might have explained the remark and evidenced his intent. In the circumstances, where the juvenile's prior remarks were at best communicated indirectly[9] to Tara through Amber, we think the evidence insufficient to support the determination that the juvenile expressed an intent to injure Tara when he made the "dumb blondes" remark.

In concluding that it was error to have denied the juvenile's motion for a required finding of not guilty,[10] we are not unmindful of the "climate of apprehension," *Commonwealth* v. *Milo M.*, 433 Mass. at 157, in which the juvenile made his vile and unsettling remarks. The series of untoward remarks occurred in the fall of 1999, just months after the April, 1999, massacre in Colorado at Columbine High School. See *id.* at 157 n.8. That students, faculty, and other school and law enforcement authorities were on high alert to detect and prevent future Columbines almost goes without saying. However laudable Amber's and Tara's vigilance and willingness to report the juvenile's worrisome comments may have been, however understandable their

---

[9] That the remarks may also have been communicated somewhat imprecisely is suggested by the following. Amber testified that she told Tara of the juvenile's comments. Tara testified that she became concerned after talking to Amber on Friday and Monday, even though the hallway incident took place on Tuesday and the English class comment occurred on Wednesday. The record reflects that what Tara "heard" from Amber regarding the "dumb blondes" comment was what she then told the officer on Wednesday, i.e., that she heard she and her boyfriend were going to be shot. What Tara told the officer appears to reflect some amalgam of all three days' statements.

[10] In view of the result we reach, we do not address the juvenile's remaining claims of error.

apprehension was, and however much such disturbing conduct might warrant heightened concern and disciplinary measures, the fact remains that not all noxious and disturbing remarks are criminal threats. To conclude that the juvenile's "dumb blondes" remark, as made and in context, was a criminal threat would, we think, impermissibly expand liability for utterances well beyond what has heretofore been recognized.

The juvenile's adjudication of delinquency by reason of threatening to commit a crime is reversed.

*So ordered.*