COMMONWEALTH vs. EZEKIEL JAMES.

No. 07-P-1845.

Suffolk. September 19, 2008. - December 18, 2008.

Present: LENK, GRAHAM, & GRAINGER, JJ.

*Threatening. Evidence,* Threat.

At the trial of a criminal complaint charging the defendant with threatening to
   commit a crime against a person, in violation of G. L. c. 275, § 2, the
   judge erred in denying the defendant's motion for a required finding of not
   guilty, where the evidence produced by the Commonwealth was insuf-
   ficient to satisfy a rational trier of fact, beyond a reasonable doubt, that the
   defendant intended that his disclosures to a third party be communicated to
   the intended victim, an essential element of the crime charged. [385-387]

COMPLAINT received and sworn to in the Central Division of
the Boston Municipal Court Department on January 3, 2007.

The case was tried before *Annette Forde,* J.

*Adriana Contartese (Joseph M. Griffin, Jr.,* with her) for the
defendant.

*Anne A. Gruner (Joseph M. Ditkoff,* Assistant District At-
torney, with her) for the Commonwealth.

GRAHAM, J. After retrial,[1] a Boston Municipal Court jury
convicted the defendant of threatening to commit a crime against
a person. See G. L. c. 275, § 2. On appeal, he argues that the
Commonwealth presented insufficient evidence that he was
guilty of the charge because the evidence failed to prove he
intended to communicate the alleged threats to the victim. We
agree with the defendant and, accordingly, reverse the conviction.

*Background.* The jury could have found the following facts.
In December, 2006, the defendant was serving a sentence at the
Suffolk County house of correction. During a routine search of
prisoners' cells for possession of contraband, a correction of-

---

[1]This was the defendant's second trial on this complaint. The defendant's
first trial ended in a mistrial.

ficer discovered several letters the defendant had written to fellow inmate Ernest Johnson. In the letters, the defendant asked Johnson[2] to kill Marie Carthon, a woman the defendant had dated for a few months prior to his incarceration. After the defendant was incarcerated, Carthon initially made regular biweekly visits to see the defendant but stopped visiting him after a few months.

Incensed by Carthon's failure to visit him, and apparently convinced that she was seeing another man, the defendant, in very graphic terms, detailed the manner in which Johnson should kill Carthon. In one letter he wrote, "[I] want you to shoot that [b]itch in her stom[a]ch chest or her head . . . kill kill kill kill mu[r]der mu[r]der mu[r]der mu[r]der I want that bitch in critical cond[it]ion ICU dead or [w]hat ever . . . kill that [b]itch myself." In another letter, the defendant wrote, "[I] want you to shoot that [b]itch in her stom[a]c[h] or her chest . . . [I] want her shot and [I] want you to lay low for a couple . . . make sure you check out the place [3] [b]efo[re] you do a mission."

The defendant also expressed his belief that, during his incarceration, Carthon had used his money and home while pursuing another man romantically. The defendant wrote, "She got my house money my music lab[el] . . . and she us[ed] to come and see me all the time for the first year when [I] got knock the bitch met a young rich hustler and t[h]ought to her self that she was going to get him and its her turn." In addition, he claimed that he would have killed Carthon had he known what she was going to do to upset him.

During a tape-recorded meeting with Deputy Sheriffs Walter Pires and Michael Bevilaqua three days after the letters were discovered, the defendant admitted that he wrote the letters. He described the content of the letters as "hate death threat[s]," acknowledged that Carthon was the subject of the letters, and agreed that her home address was the same as that provided in the letters. The defendant, however, claimed that the letters were written during a passing moment of anger, and that he no longer bore her ill will. Carthon, he claimed, was never in any real danger.

---

[2]The letters written by the defendant were secreted under the mattress in Johnson's jail cell. Johnson was scheduled to be released from custody two weeks after the letters were discovered.

[3]The defendant provided Johnson with Carthon's home address.

Carthon learned of the letters from Boston police Detective Daniel Collins, who was assigned to investigate the incident. Carthon saw the letters when Detective Collins interviewed her at her home.

*Discussion.* At the close of the Commonwealth's case, the defendant made an oral motion for a required finding of not guilty, contending that the Commonwealth had failed to prove that the defendant intended that the contents of the letters be communicated to Carthon, the intended target. That motion was denied. Upon review, we consider the evidence up to the time the Commonwealth rested its case and the defendant moved for required findings of not guilty. *Commonwealth* v. *Cardenuto,* 406 Mass. 450, 454 (1990). Viewing the evidence in the light most favorable to the Commonwealth, considering all the circumstances and making appropriate inferences, we determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Cordle,* 412 Mass. 172, 175 (1992). See *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979); *Commonwealth* v. *Chhim,* 447 Mass. 370, 377 (2006) (all permissible inferences are drawn in favor of Commonwealth). See also *Commonwealth* v. *Merola,* 405 Mass. 529, 533 (1989), quoting *Commonwealth* v. *Beckett,* 373 Mass. 329, 341 (1997) (inferences "need only be reasonable and possible[, not] necessary or inescapable"). Circumstantial evidence alone may be sufficient to meet this burden. *Commonwealth* v. *Platt,* 440 Mass. 396, 401 (2003) (reviewing court considers the state of evidence at the close of the Commonwealth's case). See *Commonwealth* v. *Rojas,* 388 Mass. 626, 629 (1983).

To sustain a conviction for threatening to commit a crime against a person, G. L. c. 275, § 2, the Commonwealth must demonstrate that the defendant expressed an "intention to inflict a crime on another and an ability to do so in circumstances that would justify apprehension on the part of the recipient of the threat." *Commonwealth* v. *Robicheau,* 421 Mass. 176, 183 (1995). "Menacing words alone, even those that express a threat to commit a crime, do not constitute an offense under G. L. c. 275, § 2." *Commonwealth* v. *Furst,* 56 Mass. App. Ct. 283, 284 (2002).

The Commonwealth must also prove that the threat was "com-

municated in some manner to the defendant's intended victim, directly or through an intermediary." *Ibid.*, citing *Commonwealth v. Troy T.*, 54 Mass. App. Ct. 520, 525-526 (2002). Mere proof that threatening words reach their target is insufficient to prove a statutory violation. "The Commonwealth must [also] prove, beyond a reasonable doubt, that the defendant intended that [his] threats be communicated to [the victim]." *Commonwealth v. Meier*, 56 Mass. App. Ct. 278, 282 (2002).[4] Evidence of the defendant's intent need not be express, but "may be proved by circumstantial evidence." *Ibid.* When a defendant utters a threat to a third party who would likely communicate it to the ultimate target, the defendant's act constitutes evidence of his intent to communicate the threat to the intended victim. See *Commonwealth v. Simmons*, 69 Mass. App. Ct. 348, 351 (2007) (court-ordered therapist's disclosure that she was obligated to inform "appropriate authorities" of any statements the defendant made involving harming himself or others, coupled with the defendant's directive that the therapist "write [his threats to kill his ex-girlfriend and her current boyfriend] down," demonstrated that he intended for the threats to "to reach the target persons, with the appropriate authorities, the Leominster police department or the probation department, serving as his intended intermediary"). See also *Commonwealth v. Maiden*, 61 Mass. App. Ct. 433, 434 (2004) (defendant's threat against a romantic rival made in a court room in close physical proximity to the rival and overheard by a police officer warranted a finding that the defendant intended the threat be communicated to the victim either directly or through an officer acting as an intermediary). The Commonwealth contends that the letters clearly establish the defendant's intent to have Johnson act as his intermediary in communicating a threat to Carthon. It argues, among other things, that the defendant's devotion of a substantial portion of his letters to describing the victim's alleged acts of betrayal was

---

[4]There is no indication in the record that the defendant was charged with the offense of soliciting Johnson to commit a crime, the more obvious offense based on the facts of this case. See *Commonwealth v. Barsell*, 424 Mass. 737, 738 (1997), quoting from *Commonwealth v. Flagg*, 135 Mass. 545, 549 (1883) (solicitation of another to commit a felony is an indictable offense). Although we assume, for purposes of this opinion, that the defendant's remarks to Johnson were threats, we do not decide whether a solicitation to commit a crime per se constitutes a threat to commit the same offense. See *Furst, supra* at 285 n.3.

irrelevant to Johnson's ability to carry out the shooting, and thus supports an inference that the defendant intended for Johnson to inform the victim, prior to shooting her, that he was doing so on behalf of the defendant. The defendant, argues the Commonwealth, wanted Johnson to inform Carthon that the killing was not a random act of violence, but was, instead, a form of retribution for her past actions against the defendant.

We are not persuaded by the Commonwealth's argument, and conclude that the case is governed, in material respects, by this court's decision in *Commonwealth* v. *Furst, supra.* In *Furst,* the defendant took a third party (Carson) into her confidence, and sought his help to kill her estranged husband. The defendant had approximately thirty conversations with Carson in which she expressed anger at her husband and told him, "I'd like to see [my husband] killed. I'd like to see him disappear." *Id.* at 284. On one occasion she offered Carson money to kill her husband. On another occasion she offered him sex. We concluded in *Furst* that the jury could not reasonably infer that the defendant intended the third party to inform her husband of her statements. Here, as in *Furst, supra,* the defendant "approached [the third party] as a potential partner in crime, and not as one who would likely communicate [his] statements to the intended victim." *Id.* at 285. Because the evidence produced by the Commonwealth was insufficient to satisfy a rational trier of fact, beyond a reasonable doubt, that the defendant intended that his disclosures to Johnson be communicated to Carthon, an essential element of the crime charged, the defendant's conviction must be vacated.

*Judgment reversed.*

*Verdict set aside.*

*Judgment for the defendant.*