Lauriat, Peter M., J.
Gary Zapelli (“Zapelli”), stands indicted on a charge of a making a threat relative to the location of explosives, in violation of G.L.c. 269, § 14(b). That statute provides, in relevant part that
whoever willfully communicates or causes to be communicated, either directly or indirectly, orally, in writing, by mail, by use of a telephone or telecommunication device including, but not limited to, electronic mail, Internet communications and facsimile communications, through an electronic communication device or by any other means, a threat
(1) that... an explosive or incendiary device . . . will be used at a place or location, or is present or will be present at a place or location, *137 whether or not the same is in fact used or present; . . . shall be punished . . .
Zapelli allegedly committed this offense between August 1 and August 31, 2013. He was indicted on this charge by a Grand Juiy in the Middlesex County Grand Jury on December 15, 2013.
Zapelli has now moved to dismiss the indictment. He asserts that the prosecution of the present case violates his rights under the First Amendment to the United States Constitution and Article 16 of the Massachusetts Declaration of Rights; and that the intentional or reckless introduction of false evidence compromised the integrity of the grand jury.
Upon consideration of the evidence, memoranda, and oral arguments of counsel, Zapelli’s motion to dismiss is allowed.[1]
BACKGROUND
On or about August 20, 2013, Kassandra Pappas (“Pappas”), an employee of National Development, received notification, via an internet application called “Google Alerts,” that there was an internet posting concerning Station Landing, a National Development retail and apartment housing complex in Medford. Pappas was directed to an internet site called Madein-Medford.com, which had a video entitled “Special Effects at Station Landing.” That video showed a building in the Station Landing retail complex that housed the James Joseph Hair Salon. In the brief video, one of the windows of the salon appeared to explode outward, with the presence of flames and smoke. Despite the explosion, traffic and a nearby pedestrian appeared unaffected, and the remainder of the building remained intact. Below the video, the text reads: “This video was created with Adobe After Effects. Foot Note: No hair stylist [sic] were hurt during the filming of this video.”
According to Pappas, the rental office of Station Landing is also housed in this building. Upon seeing the video, Pappas remembered that her supervisor, Roseanne Sdoia (“Sdoia”), had lost a leg in the Boston Marathon bombings on April 15, 2013. Pappas found the video upsetting, and felt it was a threat against the building. She forwarded it to the property manager, Brian Trott (“Trott”). Sdoia does not work at the Station Landing location. In fact, Sdoia’s office is in the main office of National Development in Newton Lower Falls, Massachusetts, and she would only visit Station Landing when, on occasion, she was called in to deal with issues there. Notably, following the Marathon bombing, Sdoia was out of work for about six months, and at the time of the grand juiy proceedings in this case, had only recently returned to work on a part-time basis.
After viewing the video, Trott forwarded it to several people within National Development to gauge their reactions. Trott found the video shocking, but he was more concerned that if Sdoia saw the video, considering her injury, she would not return to work. Upon the advice of National Development’s counsel, Trott took the video to the police. His intent in taking the video to the police was to have it removed before Sdoia could see it.
In his grand juiy testimony, Trott stated that Zapelli was a veiy difficult residential tenant, and that he allegedly posted negative comments about Sdoia, Trott, and National Development online. Trott testified that after the Marathon bombings, Zapelli was allegedly contacted to remove negative comments about Sdoia, but he claimed that they were not his postings.
When Sdoia later saw the video, she found it “disturbing” and thought it was a direct threat to her because of her involvement in the marathon bombing. It was also brought to her attention that a few weeks after the bombing, her injury was referenced in a blog entitled “Are The Owners of Station Landing Hiding Something?” contained in a post entitled “75 SL-Does Karma play a role in our lives?” (Exhibit 2) (“It was brought to the attention of this writer that one of the people mentioned in this blog had been injured at the marathon the day of the bombings. While no one wishes such horrific things upon anyone, the past and the actions of people cannot [sic] be changed and some how [sic] forgiving [sic] just because of a bad event.”).
Sdoia described her relationship with Zapelli as “argumentative” and “very personal.” After two years of residence at Station Landing, National Development declined to renew Zapelli’s lease. Consequently, Zapelli sued National Development, but that action was dismissed. After Zapelli vacated his apartment, National Development served him with a no trespass order to prevent him from returning to the properly.
Paul Mackowski (“Mackowski”), a detective sergeant with the Medford Police Department, interviewed Zapelli on September 4, 2013 regarding the video. During this interview, Zapelli stated that he made the video approximately two years earlier and that he frequently made videos with special computer effects, as he was a self-employed graphic designer. Zapelli alleged that he had sent the video to a woman named Kelly Kane (“Kane”), an employee of the James Joseph Salon, approximately two years ago, but had reposted it in August of 2013. Mackowski confirmed with Kane that the video had been sent to her two years earlier. When Mackowski questioned Zapelli about the video, Zapelli stated that his intent was to showcase special effects through the use of a computer program, and that he would never think of blowing something up or hurting someone. (Exhibit 3.)
Zapelli was indicted by the Grand Juiy on charges of False Reports Relative to Location of Explosives in violation of G.L.c. 269, §14(b).
DISCUSSION
Zapelli contends that the indictment should be dismissed because it violates his rights under the First *138 Amendment to the United States Constitution as well as Article 16 of the Massachusetts Declaration of Rights, and because the Commonwealth knowingly or recklessly presented false information to the Grand Jury.
I.
Speech is protected from government regulation by the First Amendment to the United States Constitution and Article 16 of the Massachusetts Declaration of Rights, as amended by Article 77 of the Amendments to the Massachusetts Constitution. The First Amendment, applicable to the States through the Fourteenth Amendment, provides that “Congress shall make no law . . . abridging the freedom of speech.” This protection of free speech allows “free trade in ideas,” which includes those that the majority of people might find distasteful or discomforting. See Texas v. Johnson, 491 U.S. 397, 414 (1989) (“If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable”). “The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.” Black v. Virginia, 538 U.S. 343, 358 (2003). See, e.g., R.A.V. v. City of St Paul, 505 U.S. 377, 382 (1992); Johnson, 491 U.S. at 405-06.
However, these protections are not absolute, and it has been long recognized that the government may regulate certain categories of expression consistent with the Constitution. See, e.g., Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942) (“There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem”). The First Amendment permits “restrictions upon the content of speech in a few limited areas . . . that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.” R.A.V., 505 U.S. at 382-83 (quoting Chaplinsky v. New Hampshire, 315 U.S. at 572). Among these limited classes of speech are “fighting words” and “true threats.” Black, 538 U.S. at 359; O’Brien v. Borowski, 461 Mass. 415, 422 (2001).
In Black, 538 U.S. at 359-60 (quoting R.A.V., 505 U.S. at 388), the Supreme Court declared that
‘True threats” encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals . .. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats “protect[s] individuals from the fear of violence’ and ‘from the disruption that fear engenders,” in addition to protecting people “from the possibility that the threatened violence will occur.” (Citations omitted.)
See United States v. Cassel, 408 F.3d 622, 633 (9th Cir. 2005) (Black’s definition of “true threat” binding on lower courts); see also Commonwealth v. Robincheau, 421 Mass. 176, 183 (1995) (“FirstAmendment does not protect conduct that threatens another”). In Black, the Supreme Court upheld the constitutionality of a Virginia law that prohibited the burning of a cross with intent to intimidate, concluding that, in view of the Ku Klux Klan’s “long and pernicious histoiy” of using the burning cross “ as a signal of impending violence,” it constituted a true threat, unprotected by the First Amendment, when committed with an intent to intimidate. Black, 538 U.S. at 363 (emphasis added). The Court noted that “[intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.” Id. at 360. Significantly, a plurality of the Court noted that cross burning was protected speech under the First Amendment if not done with such an intent. Virginia v. Black, 538 U.S. 343, 365-67 (2003).
“The term ‘true threat’ has been adopted to help distinguish between words that literally threaten but have an expressive purpose such as political hyperbole, and words that are intended to place the target of the threat in fear, whether the threat is veiled or explicit.” Commonwealth v. Chou, 433 Mass. 229, 236 (2001). A true threat does not require “an explicit statement of an intention to harm the victim as long as circumstances support the victim’s fearful or apprehensive response.” Id. at 237 (2001) (communication not protected by the First Amendment because it was intended to ‘get back’ at the victim). Considering Chou and Black together, the “true threat” doctrine “applies not only to direct threats of imminent physical harm, but to words or actions that — taking into account the context in which they arise — cause the victim to fear such harm now or in the future and evince intent on the part of the speaker or actor to cause such fear.” O’Brien, 461 Mass. at 425.
In several cases, the Supreme Judicial Court has recognized specific actions that satisfy the “true threat” requirement. A pattern of harassment will satisfy the “true threat” requirement if, in fact, it causes fear, intimidation, abuse, or damage to property. See Chou, 433 Mass, at 236-37. Where the acts are aimed at a specific person, an intent to cause “abuse” is consistent with a true threat where abuse is defined as “attempting to cause or causing physical harm to another or placing another in fear of imminent serious physical harm." O’Brien, 461 Mass. at 427; see also G.L.c. 258E, §1. An intent to cause property damage is also a true threat because it constitutes an intent to commit a criminal act. O’Brien, 461 Mass. at 427. However, the court in O’Brien declined to expand a true threat to include a general “intent to cause fear.” Id. (“An intent to cause fear ... is less certain to be *139 consistent with a true threat unless we narrow what it is that must be feared”).
The word “threatened” is not defined by statute, however, it has been formulated in case law to mean “an expression of intention to inflict a crime on another and an ability to do so in circumstances that would justify apprehension on the part of the recipient of the threat.” Commonwealth v. Maiden, 61 Mass.App.Ct. 433, 434 (2004) (quoting Commonwealth v. Milo M., 433 Mass 149, 151 (2001)); see G.L.c. 275, §2. Athreat must be tested objectively, which “requires that the threat be made in circumstances that would reasonably justify apprehension on the part of an ordinary person.” Commonwealth v. Sholley, 423 Mass. 721, 725 (2000). While not explicit, “communication is a critical element of the threat in the sense that it must be uttered, not idly, but to the target, to one who the defendant intends to pass it on to the target, or to one who the defendant should know will probably pass it on to the target.” Commonwealth v. Hokanson, 74 Mass.App.Ct. 403, 406 (2009) (quoting Commonwealth v. Maiden, 61 Mass.App.Ct. 443, 435 (2004) (internal quotations omitted). See, e.g., Commonwealth v. Milo M., 433 Mass. at 158. When the threat is communicated directly, there is little doubt of intent. See, e.g., Commonwealth v. Sholley, 423 Mass. at 724-25 (2000). However, when an intermediary separates the defendant from his intended target, it must be proved that the defendant intended that the threat be communicated through the intermediary. See Commonwealth v. Furst, 56 Mass.App.Ct., 283, 285 (2002).
Here, Zapelli’s alleged posting of the video lacked the intent necessary to satisfy the “true threat” exception to First Amendment protection. There is no evidence that Zapelli intended to create fear that there would be a bombing of Station Landing. The video was not posted in conjunction with any threatening language — indeed, the caption included a disclaimer. Further, there is no evidence that the victim (s) had a fearful or apprehensive response.
Although Pappas was upset by the video, simply emailing it to her supervisor fails to support an inference that she feared bodily harm or death. Similarly, Trott failed to express a threatened or fearful response; only upon the advice of legal counsel did he take the video to the police. Although it is reasonable to conclude that Sdoia might be fearful and upset by the video in light of her injury, the fact that she worked at the Station Landing office infrequently, and that she was away from work during the time the video was posted, tend to mitigate the “circumstances that would reasonably justify apprehension on the part of an ordinary person.” See Sholley, 423 Mass, at 725. Although there was evidence before the grand jury that Zapelli had a tumultuous relationship with the employees of National Development and Station Landing, and had posted negative comments referencing specific employees in the past, this video contained neither. There is no evidence that the video was a direct threat, or that any person believed that there was an explosive device at Station Landing. The fact that Zapelli posted the video to MadeInMedford.com, rather than sending it directly to Sdoia, to anyone at National Development, or anyone who would have been expected to communicate it to them, further demonstrates a lack of intent. See Sholley, 423 Mass. at 724-25; Hokanson, 74 Mass.App.Ct. at 406; Commonwealth v. Furst, 56 Mass.App.Ct., 283, 285 (2002).
The court is mindful of the “climate of apprehension” in the wake of the Boston Marathon Bombings. See Milo M., 433 Mass., at 157, 157 n.8; see also Commonwealth v. Troy T., 54 Mass.App.Ct. 520, 527 (2002) (student made allegedly threatening remarks several months after the massacre at Columbine High School). However, even under situations of heightened concern, “not all noxious and disturbing remarks are criminal threats.” Commonwealth v. Troy T., 54 Mass.App.Ct. 520, 527 (2002). The present indictment must be dismissed.
ORDER
For the forgoing reasons, Defendant’s Motion to Dismiss the Indictment Because the Prosecution of the Instant Case Violates Defendant’s First Amendment Rights And Because the Integrity of the Grand Jury was Compromised is ALLOWED.

Given the court’s determination of Zapelli’s First Amendment claim, it does not reach or address his separate argument alleging the impairment of the Grand Jury’s integrity.